Filed 8/28/24  P. v. Anderson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082310 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD187132) |
| R'MON HOWARD ANDERSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, David M. Rubin, Judge.  Affirmed.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant R'mon Howard Anderson appeals from the superior court order denying him resentencing pursuant to Penal Code[1] section 1172.6 following an evidentiary hearing. He asserts he is eligible for resentencing for the murder conviction he sustained because there was not substantial evidence that he acted with reckless indifference to human life. Further, he asserts the trial court failed to adequately consider his youth and potential diminished culpability when it determined he acted with reckless indifference to human life. Finally, he contends his conviction for attempted murder, which was not achieved under the theory of natural and probable consequences, is eligible for resentencing. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We take our summary of the underlying facts from our prior nonpublished opinion, *People v. Limbrick et al.*, D050414 (Feb. 5, 2010).

"Anderson was a marijuana dealer, and his main supplier was Richie Gonzalez. Usually, Anderson bought from five to 10 pounds of marijuana from Gonzale[z] at a time and occasionally as much as 20 pounds.

"On the morning of May 20, 2004, Anderson phoned Gonzalez and asked to buy 30 pounds of marijuana. Anderson and Gonzalez spoke throughout the day about Gonzalez's progress in coming up with 30 pounds.[2] At one point, Gonzalez told Anderson that he would not be able to get that much marijuana, but he later called Anderson and said he had been able to gather the 30 pounds. Gonzalez and Anderson agreed to meet at a Blockbuster store, even though Gonzalez usually conducted his drug

---

[1] Further undesignated statutory references are to the Penal Code.

[2] "Phone records indicated there were 17 calls between Anderson and Gonzale[z] from 10:34 a.m. to 8:25 p.m."

2

transactions at his girlfriend's residence or the residence of his friend, Daniell Vasquez. Vasquez often would act as Gonzalez's bodyguard.

"That night, however, Vasquez did not accompany Gonzalez. Rather, Gonzalez met his friend, David Diaz, at the Blockbuster parking lot before the drug transaction. Gonzalez asked Diaz to go with him while he met some friends, and Diaz agreed. Diaz was an addict, having used methamphetamine twice daily since 1992, and on that day had ingested his second dose about eight hours earlier. Diaz was the prosecution's primary witness at trial. At the time of trial, Diaz was in custody on a drug possession charge. Diaz, who used a fake name to avoid paying child support, also had a prior conviction for possessing drugs for sale and was to be deported at some point.

"At approximately 8:30 p.m., Anderson arrived at the parking lot and signaled Gonzalez to follow him in his truck. As Gonzalez began to follow Anderson's vehicle, he told Diaz that he was going to sell marijuana. Gonzalez followed Anderson for about 15 minutes; neither Gonzalez nor Diaz knew where they were being led. Anderson stopped near the corner of Appian Drive and Casey Street in San Diego, and Gonzalez parked behind him.

"Anderson got out of his truck as did his passengers—Limbrick and a third man wearing glasses, whom police believe was John Harris.[3] Anderson approached the driver's side of Gonzalez's truck while Limbrick and Harris approached the passenger side, where Diaz was sitting. Harris

---

[3]     "In his testimony, Anderson said his friend Harris was with him most of the day, including during the transaction with Gonzalez. At the time of trial, Harris was at large. Diaz was not shown a photo lineup with Harris because police did not have a photograph of Harris wearing glasses. We shall refer to the third man as Harris."

then walked toward a grassy area; Diaz initially thought Harris was looking for a place to urinate. But Harris did not urinate and, unbeknownst to Diaz, was probably serving as a lookout.

"Gonzalez told Anderson that he had the marijuana, which was in a box on the back seat of Gonzalez's truck. Anderson took the box of marijuana and placed it in his truck before returning to Gonzalez's truck. When Anderson returned to Gonzalez's truck, he leaned into the driver's side window and removed the keys from the ignition. At that point, Limbrick put a gun to Diaz's neck and told him, 'Don't move motherfucker.' Harris, who had returned from the grassy area, told Diaz the situation 'was serious' and Diaz 'was going to die anyway.'

"Harris removed Diaz from the truck and took his wallet and cell phone while Limbrick held the gun to Diaz's neck. While Limbrick ran to the back of Anderson's truck, Harris grabbed Diaz by his belt and dragged him to the same location. Diaz then saw Limbrick leaning with his left hand on the front of Gonzalez's truck while he pointed a gun toward the ground, where Gonzalez was lying.

"Diaz was ordered to throw himself down on the ground next to Gonzalez. Diaz pretended to comply with the order, but ran away. Limbrick fired several shots at Diaz before shooting Gonzalez in the head and killing him. Gonzalez was lying face down in the street in a pool of blood. The cause of death was a gunshot wound near Gonzalez's left eye socket, with the bullet injuring both hemispheres of the brain, the brain stem and the cerebellum. Diaz left the murder scene without calling the police because he was in the country illegally and did not want to be arrested. Police contacted Diaz several months later after finding his phone number on Gonzalez's cell phone.

"Two bullets, apparently meant for Diaz, entered the residence of the Munoz family through different windows. One bullet was found lodged in a computer, which the 13-year-old Munoz son had been using. The other bullet was found lodged in the children's bedroom closet.

"Nearby residents heard the gunshots and called the police. Police responding to the scene found eight .45-caliber cartridge casings and two bullet fragments in the street near Gonzalez. All the cartridge casings came from a Glock firearm. Based on the trajectories and the placement of the casings and bullet strikes, a police detective opined the shots were fired from someone standing near Gonzalez's truck. The door to Gonzalez's truck was open; no keys were found in or near the truck. Limbrick's left palm print was found on the front hood of Gonzalez's truck with the fingers pointing toward the windshield.

"At about 10 p.m., Anderson phoned Lionel Johnson, who also was a customer of Gonzalez and who had introduced Anderson to Gonzalez. Anderson told Johnson, 'Don't call Richie.'

"The following day Anderson told Johnson: 'We licked him [Gonzalez].' Johnson assumed that Anderson and others had stolen marijuana from Gonzalez. Later that day, Johnson accompanied Anderson to a garage in Encanto, where Anderson split the marijuana with Harris and Limbrick. Johnson knew Limbrick by his moniker, 'Grim Reaper.' Limbrick also went by the moniker 'Brim Reaper' and was a documented member of the 5/9 Brim, a Blood gang in southeast San Diego.

"When Johnson was in custody on another matter in September 2004, he learned from police that Gonzalez was dead. Johnson subsequently informed Anderson that Gonzales was dead and police might be looking for

5

him. Johnson suggested that Anderson get rid of his truck and leave the area for a while.

"The prosecution also presented evidence that in 2001 Anderson was driving a Nissan Sentra when the passenger fired a gun at a Toyota Camry or Corolla, which was ahead of the Sentra. A police officer witnessed this incident and pulled over the Sentra. Anderson remained in the car, but the shooter fled. Anderson told police that earlier he had fought with three Skyline Piru gang members. Anderson then picked up the shooter, a Lincoln Park gang member he knew. Anderson claimed that someone in the Toyota had fired a gun at them three times before the shooter fired in the air. At first, Anderson said he thought the gun was a starter pistol, but later admitted it was a real gun.

"Testifying in his own defense, Anderson denied planning a drug rip-off or robbery and knowing Gonzalez was going to be shot. Anderson testified that when he placed the box of marijuana into his truck, he was going to return to Gonzalez's truck and pay him for the marijuana. Instead, as Anderson was exiting his truck for the second time, he heard a shot and jumped back in the truck. As more shots were fired, Anderson did not know what was happening and drove off without Harris and Limbrick. When Anderson yielded to make a right turn, Harris first and then Limbrick caught up with him and jumped into Anderson's truck. When Anderson asked Limbrick what had happened, Limbrick replied: 'He moved.'

"Anderson testified that Limbrick had nothing to do with his planned drug purchase; he was in Anderson's truck because before Gonzalez had indicated that he had the 30 pounds of marijuana to sell, Anderson and others had made plans to go to [a casino] that night and a mutual friend did not have room in his vehicle for Limbrick. Anderson did not know Limbrick

6

had a firearm until they were on the way to Appian Drive and Casey Street. When Anderson looked in his rear view mirror or looked backwards at his blind spot, he saw the gun in Limbrick's lap.

"Anderson testified he did not see what Limbrick or Harris were doing at the time of the shooting. Anderson denied seeing Gonzalez on the ground and going back to Gonzalez's truck and removing Gonzalez's keys from the ignition."

Anderson testified that Limbrick and Harris were not parties to the drug deal and that they were in his car only to visit the casino. After requesting additional time to pick up money for the transaction, Anderson declined to drop the two unaffiliated men off anywhere. Anderson also testified that he was retrieving the money from his car when Limbrick began firing. However, Anderson told investigators that he did not have the money to purchase the drugs with him during the transaction. Anderson also told investigators that he instructed Limbrick, who he knew to be a "hot head," to use the gun to "scare" Gonzalez and Diaz and that when he drove off from the scene, he believed Gonzalez to be dead. Anderson asserted his statements to police were not accurate because he was both high on ecstasy and agreeing in hopes of going home.

A jury convicted Anderson of first degree murder (§ 187, subd. (a)), attempted premeditated murder (§§ 664, 187, subd. (a)), and two counts of robbery (§ 211). The jury also found true the special circumstance allegation that the murder was committed in the commission of a robbery (§ 190.2, subd. (a)(17)(A)). In a bifurcated proceeding, the trial court found Anderson had a prior serious felony conviction (§ 667, subd. (a)(1)) and a prior serious/violent or strike conviction (§ 667, subds. (b)–(i)). Accordingly, the court sentenced Anderson to state prison for life without the possibility of

parole, a consecutive term of life with the possibility of parole, and a consecutive determinate sentence of 28 years.

Anderson previously appealed, claiming 10 errors. We affirmed the trial court's judgment.

In 2022, Anderson petitioned for resentencing pursuant to section 1172.6, formerly section 1170.95.[4] The court appointed counsel to represent Anderson, held an evidentiary hearing, and found him ineligible for resentencing under section 1172.6.

## DISCUSSION

1. *Anderson is guilty of murder under current law.*

Anderson argues that he could not still be convicted of murder as an aider and abettor under current law because he did not act with reckless indifference to human life.

Senate Bill No. 1437 (2017–2018 Reg. Sess.) amended section 189 by adding subdivision (e), which states that a participant in the target felony who did not actually commit a killing is nonetheless liable for murder if he or she aided, abetted, or assisted in the actual killer in first degree murder or was a major participant in the target crime and acted with reckless indifference to human life. (§ 189, subd. (e)(3).) The result is "that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*People v. Anthony* (2019) 32 Cal.App.5th 1103, 1147.) Anderson concedes there is sufficient evidence to prove he was a major participant in the robbery and contends

---

[4]    Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022.

8

only that the evidence was insufficient to support the finding that he acted with reckless indifference to human life. He contends that his conviction is based on a theory that is no longer valid in light of *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522. In those cases, our Supreme Court "clarified 'what it means for an aiding and abetting defendant to be a "major participant" who acted with a "reckless indifference to human life." ' " (*In re Taylor* (2019) 34 Cal.App.5th 543, 546.) In *Banks*, the court addressed both prongs and identified certain factors to consider in determining whether a defendant was a major participant (*Banks*, at p. 803); *Clark* identified factors to determine whether the defendant acted with reckless indifference to human life (*Clark*, at pp. 619–623). According to *Clark*, the reckless indifference standard "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The enumerated considerations relevant to whether a defendant acts with reckless indifference to human life include the defendant's knowledge that weapons would be used and/or his personal use of weapons, the defendant's physical presence at the scene and his opportunity to restrain the killer or aid the victim; the duration of the felony; the defendant's knowledge of his accomplice's propensity to kill; and the defendant's efforts to minimize the risk of violence in the commission of the felony. (*Id.* at pp. 618–623.)

" '[R]eckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (*People v. Estrada* (1995) 11 Cal.4th 568, 577.) " '[I]t encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not

9

specifically desire that death as the outcome of his actions.' " (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1021.)

Following an evidentiary hearing, the trial court found Anderson was a major participant in the robbery and acted with reckless indifference to human life. In support of the finding that Anderson acted with reckless indifference to human life, the court cited Anderson's knowledge of Limbrick's gun, Anderson's numerical advantage, Anderson's immobilization of Gonzalez by taking the keys from his vehicle, taking Gonzalez from the vehicle and placing him on the ground, Anderson's failure to intervene, and his failure to render aid or otherwise minimize the danger to Gonzalez or Diaz. The court further relied on Anderson's admitted knowledge that guns increase the risk of violence in a crime.

We review the trial court's findings of fact for substantial evidence. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We review the entire record in the light most favorable to the order to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find beyond a reasonable doubt that in committing the robbery, Anderson acted with reckless indifference to human life. (See *People v. Elliott* (2013) 53 Cal.4th 535, 585.)

The thrust of Anderson's argument lies with his assertion that he is not culpable, and that participating in the robbery he planned, "without more," does not establish a reckless indifference to human life. He attempts to distinguish himself from the brothers in *Tison v. Arizona* (1987) 481 U.S. 137. There, the Supreme Court concluded that two brothers, who planned a prison escape in which they armed two known convicted murderers, were major participants and "subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at pp. 151–152.) The brothers also flagged

down a passing car, robbed the occupants, and guarded them at gunpoint before they were killed by the absconding prisoners; they made "no effort to assist the victims before, during, or after the shooting." (*Ibid.*)

Anderson disputes that he is similarly situated to the appellants in *Tison*. In support of his argument, he asserts that the trial court's recitation of facts is inaccurate. He repeatedly contends there is insufficient evidence to support the finding that he removed Gonzalez from the vehicle and placed him on the ground. Were we to discount that finding, we must still conclude there is substantial evidence to support the court's finding that Anderson acted with reckless indifference to human life in orchestrating and participating in this robbery.

Although Anderson did not hand a firearm to Limbrick as the brothers did in *Tison*, he was aware that Limbrick was armed before arriving to the rendezvous. After leading the victims to a remote area, Anderson prevented the victims' escape by seizing the keys from their ignition. At trial, he thrice denied removing the keys. In contrast, he now asserts that he *did* remove the keys and that his act of removing the keys was a clear signal that he intended Gonzalez to live because "dead men would not need keys to drive away." His testimony at trial was that he removed the drugs from Gonzalez's vehicle, deposited the drugs in his own vehicle, and intended to return with the money to complete the transaction when he was interrupted by gunfire. It is unclear then, based on his current assertions, when he removed the keys from the ignition. Absent some plan to harm Gonzalez, we cannot discern a reason to disable his vehicle and keep him at the scene of the transaction. As Anderson himself testified, he did business with Gonzalez for between five and eight months. The two met between 15 and 20 times, during which Anderson never had problem. If, as Anderson claims, he went to his car to

11

put the drugs away and was not involved in removing Gonzalez from the car, he left Gonzalez and Diaz with Limbrick, who was known to be an armed "hot head." Anderson knew Limbrick had no business with Gonzalez and had just instructed him to use the gun to scare the victims, despite understanding that guns increase the risk of violence. Anderson did not attempt to render aid or otherwise minimize harm to Gonzalez and Diaz following the shooting. When Limbrick and Harris got into the car, Anderson knew they were uninjured and that Limbrick was the shooter. When he confirmed Limbrick shot Gonzalez because he moved, he did not return to offer aid. He left the scene with his co-defendants and later explained to Johnson that "*we* licked him."

While Anderson was not the actual killer, we conclude he was a major participant in the underlying felony who acted with reckless indifference to human life. Accordingly, he is ineligible for relief under section 1172.6 for his murder conviction.

2. *We have no reason to believe the trial court failed to consider Anderson's youth in assessing his reckless disregard for human life.*

Anderson attempts to further diminish his culpability, arguing the court failed to properly consider Anderson's age at the time of the offense when it determined he acted with reckless indifference to human life. A defendant's youth is a relevant factor in determining whether he or she acted with reckless indifference to human life. (*In re Moore* (2021) 68 Cal.App.5th 434, 454–455.) This consideration has been extended to include defendants like Anderson, who committed this offense at the age of 21. (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 416, 418.) However, a defendant's age is not dispositive, and a court may still find a young defendant acted with reckless indifference to human life. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 586, 595 (*Mitchell*).)

12

While Anderson contends the trial court failed to take Anderson's youth into account, he offers only the bare assertion that the court did not do so. To the contrary, we have no reason to believe the court did not consider Anderson's age. Principally, Anderson's birthdate was listed in the felony complaint and information, his resentencing petition, and the abstract of judgment. Through his reply briefing, Anderson encouraged the court to consider his youth at the time of the murder in determining whether he acted with reckless indifference to human life; the court considered that brief in making its findings. "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) Anderson has failed to demonstrate that the court applied the wrong legal standard. As such, we conclude the court's consideration of Anderson's youth at the time of the offense is consistent with the applicable standard.[5]

3. *The conviction of attempted murder is ineligible for resentencing as a matter of law.*

Anderson frames his appeal of the trial court's denial of his resentencing petition as to his conviction of attempted murder as insufficiency of the evidence. We observe that the jury did not receive any instructions regarding the natural and probable consequences.

---

[5] In contrast to our recent decision in *People v. Jimenez* (2024) 103 Cal.App.5th 994, which involved a trial court ruling made in August 2021 when the case law on this subject was still in its infancy, the trial court's ruling here was made in May 2023. By that time, several published decisions had extended the section 1172.6 case law involving juvenile defendants "to defendants like [Anderson] who committed their offenses between the ages of 18 and 25." (*Id.* at pp. 1002–1003 [discussing *Mitchell, supra*, 81 Cal.App.5th 575 (decided in July 2022); *People v. Jones* (2022) 86 Cal.App.5th 1076 (decided in December 2022); and *People v. Oliver* (2023) 90 Cal.App.5th 466 (decided in March 2023)].)

Anderson is ineligible for resentencing for the attempted murder conviction. The only theory of attempted murder specified by section 1172.6 is "attempted murder under the natural and probable consequences doctrine." (§ 1172.6, subd. (a); see *People v. Coley* (2022) 77 Cal.App.5th 539, 548 [the statute "applies by its terms only to attempted murders based on the natural and probable consequences doctrine"].) Anderson's jury did not receive any natural and probable consequences instruction for the charge of attempted murder or any other charge. Accordingly, Anderson was not convicted of attempted murder on any theory implicated by section 1172.6. (See, e.g., *People v. Estrada* (2022) 77 Cal.App.5th 941, 946 [summary denial of section 1172.6 petition affirmed where record demonstrated trial court did not instruct jury on natural and probable consequences doctrine]; *People v. Offley* (2020) 48 Cal.App.5th 588, 599 ["if the jury did not receive an instruction on the natural and probable consequences doctrine, the jury could not have convicted the defendant on that basis, and the petition should be summarily denied"].) Absent jury instruction on the natural and probable consequences doctrine, Anderson is ineligible for relief on his conviction for attempted murder as a matter of law. (*People v. Daniel* (2020) 57 Cal.App.5th 666, 677.)

DISPOSITION

The order denying the petition for resentencing is affirmed.


                                                          HUFFMAN, Acting P. J.


WE CONCUR:


BUCHANAN, J.


KELETY, J.